IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| STACEY R. WEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:06-CV-308 |
| | ) | VARLAN/SHIRLEY |
| KINDRED NURSING CENTERS | ) | |
| LIMITED PARTNERSHIP, d/b/a | ) | |
| JEFFERSON CITY HEALTH AND | ) | |
| REHABILITATION CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM AND ORDER</u>

Bringing an action pursuant to the Tennessee Human Rights Act (THRA), Tenn. Code

Ann. § 4-21-401 (2005),[1] plaintiff, Stacey R. West, an African-American female, claims that

her long-time employment with defendant Kindred Nursing Centers Limited Partnership,

d/b/a Jefferson City Health and Rehabilitation Center (Kindred), was unlawfully terminated

as the result of race discrimination. Kindred, however, contends that Ms. West's

employment was terminated because she failed to perform her assigned duties and failed to

comply with Kindred's policies and procedures after having received several written

---

[1]Under this provision of the THRA, "[i]t is a discriminatory practice for an employer to ... [f]ail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin ... . Tenn. Code Ann. § 4-21-401(a)(1). In her complaint, plaintiff mistakenly indicates that this action is brought pursuant to Tenn. Code Ann. § 4-21-407 [*see* Doc. 1, p.5]; that section of the THRA, however, addresses itself only to age discrimination. Because plaintiff was thirty-nine years old at the time of the events at issue, she has no cause of action for age discrimination.

warnings. Consequently, Kindred claims that Ms. West's termination was in no way related to her race. Jurisdiction is predicated on the diversity of citizenship of the parties and the amount in controversy exceeding $75,000. *See* 28 U.S.C. § 1332(a)(1).[2]

This matter is presently before the Court on Kindred's motion for summary judgment [Doc. 8]. The issues raised have been fully briefed by the parties [*see* Docs. 11, 12, and 13] so that this matter is ripe for adjudication. For the reasons that follow, Kindred's motion will be denied.

## I.

### *Factual Background*

(A) The Players.

Ms. West has been employed for a total of seventeen years by Kindred, which operates a nursing home in Jefferson City, Tennessee (the Facility). Ms. West was first employed by Kindred for three years as a certified nursing assistant (CNA) and then as a licensed practical nurse (LPN) for the next fourteen years. At the time of her termination on April 21, 2005, Ms. West was employed as the Secured Unit Charge Nurse (Treatment Nurse) in the Facility. According to plaintiff, the Secured Unit houses patients with

---

[2]The instant complaint does not set forth the basis for this Court's jurisdiction. Rather, the Court takes judicial notice of the jurisdictional aspect of this case by relying on the pleadings filed in plaintiff's original lawsuit in this Court, No. 3:05-cv-569. There, in the Notice of Removal, Kindred alleges it is "a limited partnership organized pursuant to the laws of the State of Delaware and whose principal place of business is located in Kentucky." [*See* Doc. 1, p.3, in No. 3:05-cv-569]. It is undisputed that Ms. West is a resident and citizen of the State of Tennessee and that she is seeking $350,000 in damages [*see* Doc. 1, pp.1 and 3]. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

dementia, Alzheimer's disease, and other diseases affecting mental awareness [*see* Doc. 12, p.5]. As the primary Treatment Nurse for the Secured Unit, Ms. West was the individual responsible for following the doctors' orders with respect to treatments and patient care, and she was also responsible for recommending any changes to the patients' doctor [*see* Doc. 8-3, p.1; 8-4, p.1]. If the other nurses on the Secured Unit had recommendations for changes in a patient's care, they would make those recommendations to Ms. West, who in turn was responsible for conveying those recommendations to the doctor [*id.*]. Additionally, as part of her duties, Ms. West was responsible for providing patient care in a manner that assured patient safety and promoted the patient's well-being [Doc. 8-3, pp.1-2; Doc. 8-4, p.1].

Carl Brown, also an African-American, is the LPN Unit Manager for Kindred and has now been working in that capacity for more than three years.[3] As LPN Unit Manager, Mr. Brown's duties include supervising approximately twenty people, ensuring that there is adequate staff in the units, ensuring that the patients are properly treated, and auditing the Medication Administration Records (MARS) for the patients. Notably, Mr. Brown was Ms. West's direct supervisor at the time of her termination.

Karen Hamrick is the Director of Nursing for Kindred and has now worked in that capacity for over four years at the Facility.[4] As will become apparent, Ms. West's primary evidence of race discrimination is based on some purported comments by Ms. Hamrick.

---

[3]Mr. Brown, however, had only been working for approximately one year in that capacity at the time of Ms. West's termination.

[4]Ms. Hamrick had only worked in that capacity for approximately two years at the time of Ms. West's termination.

John David Waldrop is the Executive Director of the Facility and has now worked in that capacity for five years.[5] As Executive Director, Mr. Waldrop is responsible for the total operations of the Facility and is specifically responsible for preparing budgets, hiring employees, handling personnel issues, and assisting in the development of Kindred's policies and procedures. As will be discussed in more detail shortly, Ms. West alleges that a single remark uttered by Mr. Waldrop is further evidence of race discrimination by Kindred.

(B) Previous Work History.

The facts of this case will, of course, be considered in the light most favorable to the plaintiff. Nevertheless, before discussing the events which precipitated Ms. West's termination in April 2005, the Court must consider disciplinary events involving Ms. West which occurred during 2004 to keep that termination in the proper context.

On May 3, 2004, Kindred issued a Written Warning to Ms. West for "signing MARS in dining room during in-services. All MARS are to be signed @ time MEDS are given." [Doc. 8-3, p.6]. That Written Warning was issued based on the observation of Aimee Oakes, a Kindred employee who works throughout Tennessee, that Ms. West signed MARS in the dining room during in-service training. According to Kindred's policy, MARS must be signed as the medication is actually given [*see* Doc. 11-3, p.4]. Furthermore, Kindred's policy requires that staff pay attention during in-service training. Although Ms. West admits

_____

[5]Mr. Waldrop had only worked in that capacity for approximately three years at the time of Ms. West's termination.

that she was not paying attention during that meeting, she denies signing MARS at that time [*see* Doc. 3-2, p.24].[6] Consequently, Ms. West refused to sign that Written Warning, and RN April Browning, a supervisor, signed it as a witness along with Ms. Hamrick in her capacity as Department Head [*see* Doc. 8-4, p.6].

On May 17, 2004, Kindred issued a Final Written Warning to Ms. West through Ms. Browning, which states that she "(1) found [Ms. West's] Med cart [with] medications on top of it (Potassium) 2 capsules - unattended. (2) Also, in souffle cups found res medication with narcotic inside - Meds were left unattended. A resident was nearby and could have easily gotten meds and could have caused harm to this resident." [Doc. 8-4, p.7]. Per Kindred's policy and as stated on that warning, "[n]o meds are to [be] left unattended @ anytime. Cart to be locked if out of sight. No meds on top of cart." [*Id.*, p.8]. Ms. West admits that she left that cart temporarily unattended but did so for the "greater good ... ." [*See* Doc. 8-2, p.25]. More specifically, Ms. West explains that as she was preparing her meds for a patient, she saw another "unsteady" patient attempting to get out of a chair and she was concerned that patient might fall [*see id.*]. Ms. West then left the cart and "grabbed the lady that [sic] was going to fall." [*Id.*]. In the meantime, Ms. Browning showed up at the unattended medicine cart as another patient was walking towards it, at "the pace of the tortoise," according to Ms. West [*id.*]. Nevertheless, Ms. Browning wrote a Final Written Warning, which Ms. West signed along with Ms. Browning and Ms. Hamrick [*see* Doc. 8-4, p.7].

---

[6]All page references to Ms. West's deposition will be to the actual deposition page number - not the docket entry page number.

On July 8, 2004, Kindred issued another Final Written Warning to Ms. West for: (1) [f]ailure to support programs and policies of the facility, *i.e.* - refusal to accept responsibilities in the Angel Care Program; and (2) [f]ailure to ensure activity schedule was followed as submitted, *i.e.*, numerous activities on first day of survey were not accomplished though Unit was fully staffed." [Doc. 8-4, p.9]. As a result of this action, Ms. West's responsibility for the Angel Care Program and her activities as the Secured Unit Co-ordinator were removed [*id.*]. This Final Written Warning reflects the signatures of Mr. Waldrop and Ms. West [*id.*, p.10].[7]

(C) Facts Related to Ms. West's Discharge From Kindred.

According to Kindred, Ms. West committed two additional serious violations of its policies and procedures on April 14 and April 20, 2005, which ultimately led to her termination. On April 14, 2005, a surveyor from the State of Tennessee came to the Facility to check on a patient as the result of a complaint by the patient's family [*see* Doc. 8-3, pp.2-3; *see also* Doc. 8-2, p.33]. According to Ms. West, if a family member calls the State surveyor to complain, the surveyor will come to the facility to evaluate the merits of the complaint [*see* Doc. 8-2, p.33]. In this case, a family member had called because the tips of the patient's fingers had been cut off, an event which would have been reported by the

---

[7]Plaintiff points to no specific testimony as any sort of explanation for this third incident. Instead, plaintiff invites the Court to, in effect, review her deposition for her explanation [*see* Doc. 12, p.5]. The Court declines to do so as it is plaintiff's burden to point out relevant testimony for consideration. *Aetna Cas. and Surety Co. v. Neff*, 30 F.Supp.2d 990, 993 (S.D. Ohio 1998).

Facility to the State at any rate [*id.*].  As the result of his missing fingertips, the patient had an order in his chart to have bandages on his fingers [*id.*, p.34;  *see also* Doc. 8-3, p.3].

However, upon observing this patient, the surveyor noted that the patient had no bandages on his fingers [*id.*].  The surveyor then interviewed Ms. West and thereafter informed Mr. Waldrop of his findings [Doc. 8-3, p.3].  Specifically, the surveyor told Mr. Waldrop that Ms. West was of the opinion that bandages were no longer needed for this patient and that she had intended to obtain a doctor's order making that change but had not done so [*id.*].  Because that order was not set forth in the chart, Kindred received a notice of deficiency from the State because the patient did not have bandages on his fingers [*see* Doc. 8-2, p.7;  *see also* Doc. 8-3, p.3].  Kindred takes the position that Ms. West was responsible for this deficiency;  Ms. West takes the position that Mr. Brown is responsible for this deficiency.  Because of this divergence of opinions, a further examination of other facts is in order.

As a general proposition, Ms. West, through counsel, alleges that each shift in the Secured Unit had its own primary Treatment Nurse.[8]  Thus, Ms. West was only the primary Treatment Nurse for the 7:00 a.m. to 3:00 p.m. shift, implying that each of the other two shifts had its own primary Treatment Nurse.

---

[8]The court would emphasize that the bulk of Ms. West's position is not set forth in her countervailing affidavit [*see* Doc. 12, pp.10-11].  Rather, many of Ms. West's so-called "facts" are merely arguments set forth in her attorney's response brief.

However, both Mr. Brown and Ms. Hamrick testify that Ms. West was the *only* Secured Unit Treatment Nurse [*see* Docs. 13-3, p.2 and 13-4, p.1]. Ms. Hamrick further describes Ms. West's responsibilities as follows:

> ... Plaintiff was the individual responsible for following the doctor's orders with respect to treatments and patient care, and recommending changes to the patient's doctor. As the Treatment Nurse, she was responsible for making sure that the doctors' orders were properly noted in the charts for the patients (or "residents") in the Secured Unit. She was also responsible for making sure that doctors' orders were being followed. ... [Plaintiff] was [not] responsible for giving every treatment to every patient, but she was responsible for overseeing the treatments and medications of the Secured Unit patients and making sure they were receiving the appropriate level of patient care.

[Doc. 13-3, pp.1-2]. Similarly, Mr. Brown testifies as follows regarding Ms. West's responsibilities:

> ... Of course, Plaintiff was not responsible for giving every medication and changing every dressing on the Secured Unit twenty-four hours a day. Rather, she was responsible for these duties on her shift and overseeing other LPNs who had these duties on other shifts. However, she was also responsible for following doctors' orders by noting these orders in the charts, making recommendations to the doctors for changes in treatment, overseeing the accuracy of the charts and checking up to make sure orders were being followed, and overseeing patient care. This was a supervisory responsibility, much in the same manner as I have supervisory responsibility over LPNs and CNAs even though they might work different shifts.

[Doc. 13-4, pp.1-2].

With respect to the specific incident on April 14, 2005, Mr. Brown testifies as follows:

> With respect to the April 14 notice of deficiency from the State, a few days prior to the State survey, Plaintiff approached me and stated that the patient would not keep the bandage on his hand. She asked me to ask Dr. Tan if she could have an order to have the bandage off. The next time Dr. Tan made his rounds, I told him what Plaintiff said. As I testified previously, Dr. Tan told me to tell Plaintiff that she could direct the patient's treatment. Dr. Tan said

that the treatment she recommended was fine. I told Plaintiff the next day that Dr. Tan said that she could have the order. Whenever I told Plaintiff a doctor said she could have an order, it was her responsibility to note the order in the chart. I assumed that she had written the order and was unaware that she had not. After the State survey, I wrote the order myself on the patient's treatment record as Plaintiff had not done so.[9]

[*See Id.*, p.2]. It must be emphasized that, according to the testimony of Mr. Waldrop, "[a]ll of the LPNs, including Mr. Brown, are allowed to write orders in charts. However, writing orders in charts was Plaintiff's front-line responsibility as the Treatment Nurse. If she received an order from a doctor, or if Mr. Brown told her to write an order on a chart, she was responsible for it." [Doc. 13-2, p.4]. Ms. Hamrick also testifies that it is not Mr. Brown's responsibility to routinely note doctors' orders on the patients' charts [*see* Doc. 8-4, p.2].

Plaintiff further alleges, through counsel, that it is Kindred's policy never to wait until the next day to note an order in a chart. In response to that allegation, Mr. Brown testifies verbatim as follows:

... [Never waiting until the next day to note an order in a chart] is incorrect, as it would depend on the context. In an emergency situation or when a doctor changed a medication, it would be more likely that an order would be written immediately. In this situation, if a Secured Unit LPN on a different shift wrote an order in a chart, it would be Plaintiff's responsibility as the Secured Unit Treatment Nurse to, for example, make sure that the order was written correctly and that the order was being followed accurately. A treatment is different from medication. Note that the treatment record is different from the medication administration record. A treatment is external, having to do with

---

[9]More specifically, that patient's treatment record reflects the following handwritten notation: "May have dressing off hands as long as resident keeps his hands out of his mouth. 4/14/05" [Doc. 12, p.12].

skin integrity only. In this situation, Plaintiff recommended a treatment, Plaintiff asked me to ask Dr. Tan for the order, Dr. Tan agreed and I told Plaintiff that she could have the order. There was absolutely nothing unusual about this in the context of a bandage on a wound. Plaintiff and I would frequently work together with doctors when a patient required a change in medication or treatment, with Plaintiff being primarily responsible for the charts.

[Doc. 13-4, p.3].

The second serious violation of Kindred's policies and procedures occurred on April 20, 2005. At approximately 7:15 a.m. that morning, Mr. Waldrop observed Ms. West presetting between three and five medicines at the Unit 1 Nurses' Station [*see* Doc. 8-3, p.3]. Ms. West then alleges, through counsel, that Mr. Waldrop "immediately went to Ms. Hamrick and stated that Ms. West should be terminated." [Doc. 12, p.4].[10] However, Mr. Waldrop testifies that what really happened was that he "asked Mr. Brown to check to see if Plaintiff had preset these medications." [Doc. 8-3, p.3]. Moreover, Mr. Waldrop testifies that, "Mr. Brown returned at approximately 7:30 a.m. and reported that the medications had not been administered and were still in the top drawer of Plaintiff's medication cart." [*Id.*]. Mr. Waldrop's testimony on this issue is supported fully by the testimony of Mr. Brown [*see* Doc. 8-5, p.2].

It must be emphasized at this juncture that Kindred's Medication Administration - General Guidelines specifically state that, "[m]edications are administered at the time they

---

[10]Again, the Court would note that Ms. West has filed no countervailing affidavit reflecting her version of events; rather, her attorney has simply made this bare allegation in plaintiff's reply brief.

are prepared. Medications are not pre-poured." [Doc. 11-3, p.3]. Furthermore, those guidelines state, "[n]o medications are kept on top of the cart." [*Id.*, p.4]. Additionally, Kindred's records reflect that Ms. West received and signed a "One-on-One In-Services for License Staff Post-Survey" on January 2, 2002, that states, "[m]ed carts must be locked up" or "keep med carts locked" no less than eight times [*see* Doc. 11-4, pp.1-3]. Both Mr. Brown and Ms. Hamrick testify that it is considered a "serious violation" of Kindred's policy for any employee to preset medications because it increases the likelihood that residents could receive the wrong medication and endanger their well-being. [*See* Doc. 8-4, p.3; Doc. 8-5, p.2]. In fact, Ms. West admits that she is aware of this component of Kindred's policy [*see* Doc. 8-2, p.43].

In light of these serious violations of Kindred's policies and procedures regarding presetting patient medications, both Mr. Brown and Ms. Hamrick concluded that Ms. West should be terminated and conveyed their recommendation to Mr. Waldrop [*see* Doc. 8-3, pp.3-4; Doc. 8-4, p.3; Doc. 8-5, p.2]. Mr. Waldrop then consulted Kindred's Human Resources corporate office in Memphis, Tennessee, to determine the appropriate disciplinary action for these offenses [*see* Doc. 8-3, p.4]. Mr. Waldrop then made the decision, based on his review of Ms. West's record, the seriousness of the offense, the recommendations from Mr. Brown, Ms. Hamrick, and Human Resources, that plaintiff should be terminated [*id.*]. Mr. Waldrop testifies further that his decision was based only on the "legitimate safety concerns for the patients at Kindred" and was "in no way related to [plaintiff's] race." [*Id.*].

Ms. West is of the opinion that the April 20 presetting incident warranted only a reprimand. However, according to Mr. Waldrop's affidavits, Ms. West's presetting of medications related directly to the Written Warning on May 3, 2004, and the Final Written Warning on May 17, 2004; thus, the next step for a related incident of misconduct is termination [*see* Doc. 8-3, p.3; *see also* Doc. 13-2, p.3].

Ms. West was replaced as Treatment Nurse on the Secured Unit by Ms. Pat Wilkerson, an African-American [*see* Doc. 8-3, p.4]. As of March 7, 2007, the date of Mr. Waldrop's initial affidavit, Ms. Wilkerson was still employed at Kindred [*id.*]. Although plaintiff alleges, through counsel, that Ms. Wilkerson has been suspended and removed from the Secured Unit, Mr. Brown testifies that Ms. Wilkerson, after assuming Ms. West's duties, "voluntarily cut down her hours to part-time and requested to work on a different hall." [Doc. 13-4, p.4]. Mr. Brown testifies also that Ms. Wilkerson was "very capable" on the Secured Unit, especially with respect to residents' activities. [*Id.*].

(D) Plaintiffs' Post-Termination Evidence of Discrimination.

In support of her position that she was discriminated on the basis of her race, Ms. West relies in part on her affidavit in which she states verbatim as follows:

> Shortly after the arrival of David Waldrop and Karen Hamrick my world started to get flipped upside down with constant petty write-ups, harassment, and continuous "watching my back", and to discover that I would suffer further humiliation by being referred to as a nigger.

[Doc. 12, pp.10-11]. However, Ms. West admits that she did not ever hear any type of racial slur, nor does she have any personal knowledge of them [*see* Doc. 8-2, pp.13-14]. Rather, she relies on the affidavits of a former Kindred employee, Mitzi Bolin, as well as a current Kindred employee, Roy Parlier. Ms. Bolin testifies verbatim as follows:

> I, Mitzi Bolin, was employed at Jefferson City Health and Rehabilitation Center for approximately 3 years. At the time of my employment, I worked as a nursing clerk and was responsible for the nursing assistants, LPN, and RN schedules, assisting with hiring new employees, etc.
>
> During my employment, I shared an office with Karen Hamrick, D.O.N.[11], and worked very closely with Karen on a daily basis.
>
> On several occassions [sic], Mrs. Hamrick would use the word, "nigger", referring to certain black employees, especially certain black employees that worked on the Secure[d] Wing.
>
> Mrs. Hamrick also referred to the Secure[d] Unit as the "black hangout", and referred to certain black employees as the "nigger clan".

[*See* Doc. 12, p.34-35]. Mr. Parlier testifies verbatim as follows:

> I, Roy Parlier, work as the maintenance assistant at Jefferson City Health and Rehabilitation Center.
>
> On one occasion I was working on the bathroom doors on the 300 hall near the shower room when David Waldrop came up to Laura Cameron, CNA[,] and stated, "Get proof on tape and Karen will fire that nigger." Mr. Waldrop was speaking of William Stokes,[12] a black CNA that was working there at the time.
>
> On another occasion, I was in Karen Hamrick's office replacing the filters in the air conditioner. Karen was speaking to some other nurses telling them that

---

[11]Presumably, this refers to Ms. Hamrick's position as Director of Nursing.

[12]William Stokes was terminated on January 8, 2004, for sexual harassment and resident abuse. [*See* Doc. 8-3, p.4].

Stacey West had contacted Aimee Oakes because some of the CNAs were threatening to go to the media over work conditions[.] That is when I heard Karen Hamrick say, "Those niggers don't run this place, I am the boss and those niggers are not going to take over 200 (Secure[d] Unit). I will get rid of every one of them."

[*See* Doc. 12, pp.36-37]. The testimony of these two witnesses is direct evidence of race discrimination by Kindred, according to Ms. West.

With respect to Ms. West's own affidavit testimony regarding the purported discrimination against her by Mr. Waldrop and Ms. Hamrick shortly after their arrival at Kindred, the Court recognizes defendant's contention that this affidavit testimony may contradict some of her earlier deposition testimony. For example, when asked if the purported racial comments made by Ms. Hamrick surprised her, Ms. West testifies as follows:

Yes, it did surprise me. Because as I said earlier, me and Karen (Hamrick) had, I felt like, had a decent relationship. She called me on my phone at night to talk about resident problems. I've talked to her on her phone at night or a different time, you know, and talked about residents or talked about, you know, things that was going on. And we had an in-service in Cookeville, Tennessee, that I rode with Karen to. And we, you know, I didn't feel like that she had that type of attitude.

[Doc. 8-2, p.14]. Kindred thus argues that Ms. West's testimony that Ms. Hamrick contributed to "flip[ping]" her world "upside down" should be disregarded because of the perceived contradiction to her deposition testimony. Similarly, Kindred argues that Ms. West's testimony regarding Mr. Waldrop's arrival as contributing to a hostile work atmosphere is belied by the fact that Mr. Waldrop gave Ms. West an Employee-of-the-Month award on April 21, 2003, for the month of March 2003. Of course, to the extent that this

affidavit contradicts any of Ms. West's previous deposition testimony, it would be entirely improper and would not be considered by the Court. *See Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony."). Nevertheless, the Court concludes that these issues relate to Ms. West's credibility and are best left to the jury's determination at trial.

## II.

### *Summary Judgment Standard*

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the burden is on the moving party to conclusively show no genuine issues of material fact exist. *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003), and the court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). However, the nonmoving party is not entitled to a trial merely on the basis of allegations, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Id.* at 323.

The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question;  but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986);  *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).  The standard for summary judgment mirrors the standard for directed verdict.  *Anderson*, 477 U.S. at 250. The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  *Id.* at 251-52.  There must be some probative evidence from which the jury could reasonably find for the nonmoving party.  If the court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment.  *Id.;  Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

III.

### *Plaintiff's THRA Claim*

Ms. West's race discrimination claims under the THRA are governed by the same analytical framework as claims asserted under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2002e, *et seq.*[13]  *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 464 (6th Cir. 2001); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996).  "To avoid a grant of

---

[13]Under Title VII of the Civil Rights Act of 1964, "it shall be an unlawful practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

summary judgment on a Title VII claim, a plaintiff must either provide direct evidence of discrimination or establish a prima facie case, which creates an inference of discrimination based on circumstantial evidence." *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003) (citing *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995)). It is unclear from plaintiff's complaint or her reply brief whether she is relying on direct evidence of discrimination or circumstantial evidence or both to prove her case. Consequently, the Court will examine plaintiff's circumstantial evidence and her direct evidence of discrimination to determine whether she can defeat summary judgment.

(A)

A prima facie case of discrimination requires Ms. West to show (1) that she is a member of a protected group, (2) that she was subject to an adverse employment decision, (3) that she was qualified for the position, and (4) that she was replaced by a person outside of the protected class.[14] *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In this case, Ms. West may not be able to satisfy the fourth element because the proof is undisputed that she was

---

[14]The fourth element may also be satisfied by showing that similarly situated non-protected employees were treated more favorably. *Mitchell*, 964 F.2d at 582-83. To be similarly situated, Ms. West and the proposed comparator must have engaged in acts of "comparable seriousness." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002). Although plaintiff does not address this issue in her reply brief, the Court takes judicial notice of the fact that three other Kindred employees were involved in a comparably serious violation of Kindred's policy by restraining a patient in a geriatric chair. *See Glenda Belcher v. Kindred Nursing Centers Limited Partnership, et al.*, No. 3:05-cv-009. Significantly, all three employees, who are white, were immediately terminated by Kindred and none have been rehired. *See id.* It would appear, therefore, that white employees did not receive favorable treatment when engaging in comparably serious violations of Kindred's policies and procedures.

replaced as Secured Unit Treatment Nurse by Ms. Wilkerson, another African-American woman, a person inside this same protected class. Nevertheless, under the unique facts of this case, the Court will not end its inquiry on this possible theory of discrimination by simply stating that plaintiff was replaced by another African-American female.

According to Kindred's own proof, Ms. Wilkerson, plaintiff's replacement, voluntarily reduced her hours to part-time and requested to work on a different hall. The record is not clear, however, as to why she requested to work on a different hall and how soon her hours were reduced from full-time to part-time. Even more troubling to the Court is a total absence of explanation in the record as to which individual then assumed plaintiff's duties in this key role of Treatment Nurse responsible for all shifts. One possible explanation would be that Kindred's initial replacement of plaintiff with Ms. Wilkerson could simply be viewed as a way to avoid a charge of race discrimination. All of this is more troubling because of plaintiff's allegation that Ms. Wilkerson "filed a racial discrimination complaint with the NAACP." [Doc. 12, p.5]. Plaintiff has failed, however, to file a copy of that complaint. Further, the so-called proof offered by plaintiff on this issue - a letter forwarded by the NAACP to Kindred dated December 15, 2006 [*see id.*, p.32] - makes no specific mention of Ms. Wilkerson's complaint. Thus, there is no evidence in the present record of any complaint by Ms. Wilkerson to the NAACP. This dearth of proof by plaintiff might be fatal to her case if she were relying solely on circumstantial evidence to prove race discrimination. However, as will now be demonstrated, plaintiff's stronger case for purposes of summary judgment analysis, is one developed by direct evidence.

(B)

The Sixth Circuit has observed that "direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999) (citations omitted). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). ("For example, a facially discriminatory employment policy or a corporate decision-maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent.") *Nguyen*, 229 F.3d at 563 (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985); *LaPointe v. United Auto Workers Local 600*, 8 F.3d 376, 379080 (6th Cir. 1993)). Once there is credible direct evidence of discrimination, the burden of persuasion then shifts to defendant to show that it would have terminated plaintiff's employment had it not been motivated by discrimination. *Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825, 829 (6th Cir. 2000) (citation omitted).

When assessing whether a remark such as the one attributed to Mr. Waldrop or those remarks attributed to Ms. Hamrick constitute direct evidence of discrimination, the court must consider the identity of the speaker. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998). Isolated remarks by individuals "with no managerial authority

over the challenged personnel decisions" ordinarily are not indicative of discrimination. *Id.* In *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990), the Sixth Circuit determined that a statement by an intermediate level official was not indicative of discrimination when the ultimate employment decision was made by an upper level official. The *McDonald* rule does not apply formalistically; remarks by any official who played a "meaningful role" in the employment decision or "may have influenced the decision" may constitute direct evidence of discrimination. *Ercegovich*, 154 F.3d at 355.

Ms. West contends that the following affidavit statements constitute direct evidence of discrimination: (1) Mr. Waldrop's instructions to Ms. Cameron - overheard by Mr. Parlier - to "get proof on tape and Karen (Hamrick) will fire that nigger [in reference to William Stokes]"; (2) Ms. Hamrick's remarks to Ms. Oakes - again overheard by Mr. Parlier - to the effect that "those niggers don't run this place, I am the boss and those niggers are not going to take over 200 (Secured Unit). I will get rid of every one of them."; (3) Ms. Hamrick's use on several occasions of the word "nigger" to Ms. Bolin as well as referring to the Secured Unit as the "black hangout" and the reference to certain black employees as the "nigger clan."[15] It must again be emphasized that Ms. West did not hear any of these comments nor does she have any personal knowledge of them [*see* Doc. 8-2, pp.13-14]. In fact, Ms. West

---

[15]There are a number of other disparaging and racist comments set forth in the complaint and in plaintiff's reply brief; however, there is no affidavit testimony supporting any of those comments, and thus they need not be considered, especially since Mr. Waldrop and Ms. Hamrick each testify that they "have never made any inappropriate remarks or comments about plaintiff's race or the race of any other employee to anyone." [*See* Docs. 8-3, p.5 and 8-4, p.4].

has no personal knowledge of any disparaging or racist comments made by any Kindred employee.

Kindred first takes the position that the Court may not consider any of the statements in either the Bolin affidavit or the Parlier affidavit because they are all "inadmissible hearsay." [*See* Doc. 11, p.10]. Ms. West has, for whatever reason, totally failed to respond to this critical issue raised in Kindred's motion; nevertheless, the Court has undertaken its own independent research to evaluate the merits of Kindred's argument.

Federal Rule of Evidence 802 clearly prohibits the admission of hearsay testimony into evidence. Hearsay is defined as "an out-of-court statement 'offered in evidence to prove the truth of the matter asserted.'" *United States v. Chalil*, 279 F.3d 358, 363-64 (6th Cir. 2002) (quoting Fed. R. Evid. 801(c)). Contrary to Kindred's insistence, the disparaging racist comments allegedly made by Mr. Waldrop and Ms. Hamrick are not necessarily offered to prove the truth of the statements but to demonstrate the purported racial attitudes of Mr. Waldrop and Ms. Hamrick. Accordingly, the statements are not hearsay. *See Talley*, 61 F.3d at 1249 (citing *Hunter v. Allis-Chalmers Corp. Engine Div.*, 797 F.2d 1417, 1421 (7th Cir. 1986) (holding that evidence that a supervisor called blacks "niggers" was not hearsay when offered in a Title VII action to show the supervisor's racial attitudes)). Moreover, as observed by the court in *Talley*, even if this Court were to agree with Kindred that the racial slurs were hearsay, they would be admissible under the hearsay exception for statements of the declarant's then-existing state of mind. *Id.* at 1249-50 (citing Fed. R. Evid. 803(3) and *Detroit Police Officers' Assn. v. Young*, 608 F.2d 671, 693 (6th Cir. 1979)

(concluding that testimony about a discriminatory purpose falls within Fed. R. Evid. 803(3), *cert. denied*, 452 U.S. 938 (1981)).  Consequently, this Court concludes, as did the *Talley* court, that these affidavits are not hearsay and are properly admissible as direct evidence of discrimination by Kindred.

Kindred next contends that none of the remarks by Ms. Hamrick can be considered because she did not make the ultimate decision to terminate Ms. West.  However, Ms. Hamrick did play a "meaningful role" in the employment decision to fire Ms. West as she was one of only two people to make a recommendation to Mr. Waldrop to do so.  *See Ercegovich*, 154 F.3d at 355.  Ms. Hamrick thus "may have influenced the decision" to fire Ms. West and therefore her alleged racist remarks cannot be excluded from evidence on this basis as they may constitute direct evidence of discrimination.  *See id.*  Furthermore, the Court is particularly troubled by Mr. Parlier's testimony that he heard Ms. Hamrick's announcement that she was "the boss and those niggers are not going to take over 200 (Secured Unit) [and that she] will get rid of every one of them."  [*See* Doc. 12, p.37].  Obviously, Ms. Hamrick's statement directly relates to the employment decision about Ms. West because Ms. West worked in the Secured Unit at that time.

Kindred also argues that the one racist remark by Mr. Waldrop and the repeated racial slurs by Ms. Hamrick are too isolated and ambiguous to be considered either by the Court or by a jury.  The Court is, of course, aware of authority in the Sixth Circuit that "'isolated and ambiguous statements ... [can be] too abstract, in addition to being irrelevant and prejudicial, to support a finding of ... discrimination.'"  *LaPointe*, 8 F.3d at 380 (quoting

*Gagne v. Northwestern Natl. Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989)).  However, this Court, like the court in *Talley*, is of the opinion that the *LaPointe* rule "has no application here because the repeated usage of racial slurs in this case cannot be termed isolated or abstract."  *Talley*, 61 F.3d at 1249 n. 2.  Moreover, the alleged racist remarks by both Mr. Waldrop and Ms. Hamrick not only encompassed racial slurs but also encompassed racial slurs in the context of employment decisions.  *See also Miles v. M.N.C. Corp.*, 750 F.2d 867, 875-76 (11th Cir. 1985) (the court held that racial slurs made by a manager were direct evidence of discrimination sufficient to get the case to the jury) and *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 774-75 (11th Cir. 1982) (the court concluded that statements by a principal about his concern that a "white presence" be maintained among the faculty at a newly integrated school in order to avoid "white flight" constituted direct evidence that the school board acted with a discriminatory motivation in firing a black teacher) (both cases cited with approval by the Sixth Circuit in *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir. 1985)).

Finally, Kindred takes the position that any purported racial remark by Mr. Waldrop regarding former employee Stokes is too far temporally removed from the termination decision involving Ms. West to be considered.  The record reflects that Mr. Stokes was terminated on January 8, 2004 [*see* Doc. 8-3, p.4].  Ms. West was not terminated for another 15 months.  Similarly, Kindred points out that any remarks purportedly made by Ms. Hamrick to Ms. Bolin are too far temporally removed from Ms. West's termination.  The record clearly reflects that Ms. Bolin resigned her position from Kindred on November 4,

2005 [*id.*], some six months before Ms. West was terminated. Furthermore, Ms. Bolin's affidavit does not establish any sort of time frame as to when Ms. Hamrick purportedly made those comments; nevertheless, at a minimum, they would have been made prior to November 4, 2004.

When all of this evidence is considered, the Court remains concerned about the fact that a long-time employee of Kindred apparently had little, if any, write-ups or other employment issues with Kindred until the arrival of Mr. Waldrop, some three years before Ms. West's termination, and the arrival of Ms. Hamrick, some two years before Ms. West's termination. The evidence presented by Ms. West in her affidavits, if believed, establishes pervasive use of disparaging and racist comments in the context of specific employment decisions, albeit not specifically in her case. Certainly, "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy plaintiff's burden of demonstrating animus." *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) (internal quotation marks omitted). However, it simply cannot be said in this case that the remarks made by Mr. Waldrop and Ms. Hamrick are unrelated to the overall decisional process of Kindred to terminate African-American employees because of their race as Ms. West alleges.

Moreover, in the Court's view, Kindred has not fully insulated itself from further inquiry in this case by a jury simply because Mr. Brown, an African-American employee, was also included in the decisional process. Nor is Kindred fully insulated by the fact that Ms. West was replaced by Ms. Wilkerson, another African-American, especially since her

24

current status is somewhat murky as is the status of the person who replaced Ms. Wilkerson and how soon that occurred. All of these facts need to be presented to the jury so that the jury can determine Kindred's actual motives for terminating Ms. West. Because Ms. West has introduced credible direct evidence of discrimination, the burden of persuasion has now shifted to Kindred to show that it would have terminated plaintiff's employment even had it not been motivated by discrimination. *See Laderach*, 207 F.3d at 829. Moreover, the Court cannot determine whether Kindred has met its burden of persuasion as a matter of law because its decision to terminate Ms. West relies so heavily on the Final Written Warning issued on May 17, 2004, as a key predicate offense; yet, Ms. West has an extremely rational explanation for leaving the cart unattended on that day - to prevent another patient from falling. The Court notes too that this key Final Written Warning was issued just two years after Mr. Waldrop arrived at Kindred and only one year after Ms. Hamrick. All of this casts some doubt on Kindred's explanation.

In sum, the Court is of the opinion, that Ms. West has presented sufficient evidence to enable a reasonable jury to conclude that Kindred would not have discharged her but for her race. Kindred, on the other hand, has produced evidence that Ms. West lost her job because she was not performing effectively, and a jury may be rationally satisfied with Kindred's explanation. But the ultimate decision of whether Kindred's proffered reason for discharging Ms. West was legitimate or not is a matter for the jury to determine. Based upon the present record, the Court is of the opinion that the issue cannot be decided as a matter of

law.  In short, the Court concludes that there is more than a "scintilla of evidence" that Kindred may have discharged Ms. West based on her race.

IV.

*Conclusion*

For the reasons foregoing, Kindred's motion for summary judgment [Doc. 8] is hereby DENIED.[16]

**E N T E R :**

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

---

[16]The Court's rendering of this opinion leads it to the conclusion that mediation might prove beneficial to the parties in this case, particularly in light of the potential weaknesses in the parties' respective positions as reflected in this opinion.  The parties are encouraged to explore such alternative dispute resolution *See* Local Rule 16.3.